UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

STELLA ANNA OPRA,                        Case No. 05-72663
                                              Chapter 7
        Debtor.                        Judge Thomas J. Tucker
_____/

**OPINION SUSTAINING TRUSTEE'S OBJECTION TO DEBTOR'S AMENDED
EXEMPTIONS, AND SANCTIONING DEBTOR'S FORMER ATTORNEY AND HIS
LAW FIRM FOR VIOLATING FED. R. BANKR. P. 9011(b)**

**I. Introduction**

In this Chapter 7 bankruptcy case, the Debtor failed to disclose a personal injury claim that later proved to be worth $100,000.00. Debtor's attorney filed her petition and schedules knowing about the pre-petition motorcycle accident giving rise to the claim, and knowing about the serious injuries Debtor suffered in the accident. Yet Debtor's attorney did not list the claim or disclose any information about the accident in Debtor's schedules or Statement of Financial Affairs.

Debtor's personal injury claim came to light only when a creditor questioned Debtor about it at the § 341 meeting. *Seven months* later, with a new attorney, Debtor amended her Schedules B and C to list and exempt the asset. Debtor now claims exemptions totaling $28,550.00 of the $100,000.00 asset. The Chapter 7 Trustee objected to the amended exemptions, arguing that Debtor's initial failure to disclose the asset was an intentional concealment and bad faith. Debtor denies the Trustee's charge.

This dispute is before the Court on (1) the "Trustee's Objection to Debtor's Exemptions," (Docket # 39); and (2) the Court's "Order Requiring Debtor's Former Attorney And His Firm To Appear And Show Cause Why They Have Not Violated Fed.R.Bankr.P. 9011(b)" (Docket # 63).

The show cause order required attorney Ronald R. Dixon and his firm, Ronald R. Dixon, PLLC, to "appear and show cause why they have not violated Fed.R.Bankr.P. 9011(b), and why they should not be sanctioned for doing so," for failing to disclose Debtor's personal injury claim in her original Schedule B. The Court held hearings, including an evidentiary hearing, and took these matters under advisement.

The Court concludes that Debtor's failure to disclose her personal injury claim in her original Schedule B was an intentional concealment of that asset, and that Debtor acted in bad faith. As a result, the Court will sustain the Trustee's objection to Debtor's amended exemptions. The Court further concludes that Debtor's former attorney and his law firm violated Fed.R.Civ.P. 9011(b), and the Court will impose an appropriate sanction.

## II. Facts

### A. Pre-petition events

On July 15, 2005, two months before filing this bankruptcy case, Debtor Stella Opra was hit head-on by a drunk driver while riding on the back of her husband's motorcycle.[1] She and her husband were seriously injured. Before the accident, Debtor had retained an attorney, Robert Crosby, to defend a collection case brought by creditors Anthony and Beverly Raymon. After the accident, Mr. Crosby referred Debtor to Edward E. Souweidane, a personal injury lawyer, to pursue a personal injury claim. Crosby also referred Debtor to attorney Ronald R. Dixon, for the purpose of filing bankruptcy.

---

[1] The record is inconsistent regarding the date of the accident, which happened late at night. Sometimes the record reflects that the accident occurred on July 15, 2005, sometimes the date of the accident is stated as July 16, 2005.

2

On July 19, 2005, Debtor signed a retainer agreement, retaining the law firm of Fraser & Souweidane, P.C. "to prosecute one or more claims and all damages sustained by [Debtor and her husband] as a result of [a] motor vehicle collision on July 16, 2005" against Michael Rashad Gregory, the driver of the other vehicle.[2] The Retainer Agreement says that Fraser & Souweidane, P.C. are: "Attorneys Specializing in Personal Injury Litigation." Debtor, as "the Client," and Edward E. Souweidane, as "the Attorney," signed the Retainer Agreement.

On September 26, 2005, hours before filing bankruptcy, Debtor testified under oath at a creditor's exam in Macomb County Circuit Court. That creditor's exam was conducted by Paul T. Joseph, the attorney representing Anthony and Beverly Raymon. Debtor testified that she had retained an attorney to represent her interests in any potential personal injury claim; that she was not pursuing the other driver who caused the collision because he was not insured and had no assets; and that she had no expectation of recovery.[3]

**B.  The bankruptcy filing**

Later in the day on September 26, 2005, Debtor filed a voluntary petition for relief under Chapter 7, with schedules and a Statement of Financial Affairs. Debtor's petition was signed by her attorney, Ronald R. Dixon of the firm Ronald R. Dixon, P.L.L.C., who prepared Debtor's schedules and continued to represent her in this bankruptcy case until at least June 15, 2006.[4]

---

[2] (*See* Retainer Agreement (Docket # 39, Ex. B of "Trustee's Objection to Debtor's Exemptions").)

[3] (*See* Aff. of Paul T. Joseph at ¶¶ 1-4 (attached to Anthony and Beverly Raymon's "Response To Trustee's Objection To Debtor's Exemptions" (Docket # 42).)

[4] On July 10, 2006, a notice of substitution of counsel was filed, substituting attorney Kevin F. Carr for Mr. Dixon as counsel for Debtor. (Docket # 44.) Earlier, however, on June 15, 2006, attorney Carr filed amended Schedules B and C on behalf of Debtor. (Docket # 36.)

3

Although the instructions for Schedule B instruct the debtor to "list all personal property of the debtor of whatever kind," Debtor did not disclose any personal injury claim in her Schedule B, or anywhere else in her schedules or Statement of Financial Affairs.

On Schedule B, next to Item # 20, which required Debtor to list "[o]ther contingent and unliquidated claims of every nature," Debtor stated "None." Debtor likewise stated "None" next to Item # 33, which required Debtor to list "[o]ther personal property of any kind not already listed." With her schedules, Debtor signed and filed a declaration under penalty of perjury, stating that she had "read the foregoing summary and schedules, . . . and that they are true and correct to the best of my knowledge, information, and belief."[5]

### C. The § 341 meeting

On November 16, 2005, Debtor attended a § 341 meeting of creditors. Before the § 341 meeting began, Debtor completed, signed, and returned to the Trustee a "Section 341 Trustee Questionnaire."[6] In signing the Questionnaire, Debtor "declare[d] under penalty of perjury that the information provided [in the Questionnaire is] true and correct." In response to Question 10 on the Questionnaire, which read: "Are you thinking about suing anyone for any reason?," Debtor circled "No." In response to Question 11 which read: "Are you receiving now or do you have the right to receive any payments from a lawsuit, divorce judgment, or other award or settlement?,"

---

[5] (Docket # 1 at 5, 7, 8, 56.)

[6] (Docket # 39, Ex. A of "Trustee's Objection to Debtor's Exemptions.") At the evidentiary hearing on August 14, 2006, Debtor at first testified that Mr. Dixon had filled out the Questionnaire and then had her sign it. Later, Debtor appeared less certain of this, and stated that she thought Dixon had filled out the Questionnaire, but she wasn't sure. Mr. Dixon, on the other hand, testified that Debtor had completed the Questionnaire. The Court finds that Debtor completed the Questionnaire, but this finding is not crucial to its decision. Its conclusions on the ultimate issues presented in this case would be the same even if Mr. Dixon had filled out the Questionnaire and Debtor had simply signed it.

4

Debtor circled "No." In response to Question 15 which read: "Have you disclosed all of your assets and all of your creditors in your bankruptcy schedules?," Debtor circled "Yes." And in response to Question 16 which read: "Is all of the information in your bankruptcy schedules and statements true and accurate?," Debtor circled "Yes."

During the § 341 meeting, Paul Joseph, attorney for the Raymons, who had conducted the September 26, 2005 creditor's exam in Macomb County Circuit Court, questioned Debtor about her accident.[7] In response to these questions, Debtor disclosed, for the first time in this bankruptcy case, that she and her husband had suffered injuries in the accident on July 15, 2005.[8] Debtor then falsely testified that she had listed a potential claim based on the accident in her schedules, but had valued it at zero. She listed the claim this way, she said, because "the guy [who hit me and my husband] didn't have any insurance."[9] Debtor also falsely testified that she had not retained a lawyer regarding the accident.[10] Debtor testified that her husband had, however, retained an attorney and that his name was "Ed something," but that she was "not sure of his name."[11] Attorney Joseph asked Debtor if the lawyer her husband had retained was a

---

[7] (*See* Tr. of Nov. 16, 2005 Section 341 Meeting at 3 lns. 23-25, 4 lns. 1-25, 5 lns 1-9.)

[8] (*See id.* at 4 lns. 1-7, 24-25, 5 lns. 1-2.)

[9] (*See id.* at 4 lns. 8-13.)

[10] (*See id.* at 4 lns. 8-17.)

[11] (*See id.* at 4 lns. 14-15, 18-20.)

5

personal injury specialist.[12]  Debtor falsely testified: "No, he's not."  Debtor then retracted this response by saying that she was not sure about that.[13]

When the Trustee stated that he could not find a potential claim based on the accident in Debtor's schedules or Statement of Financial Affairs, Mr. Dixon stated "I'll amend and put it in there."[14]  Later in the § 341 meeting, Mr. Dixon stated, regarding the accident, that although Debtor had sustained "severe personal injury," and "has pins up and down and a . . . Titanium pelvis,"  "No cause of action, no recovery.  Believe me, I looked at that."[15]

### D.  Debtor's belated amendments to Schedules B and C

On January 31, 2006, sometime after having discovered that Mr. Souweidane was representing Debtor concerning a personal injury claim, the Chapter 7 Trustee's attorney wrote a letter to Souweidane, stating that "[Debtor's] portion of . . . any personal injury recovery which [he was] pursuing is an asset of the bankruptcy estate" and that any settlement would need to be discussed with the Trustee and approved by the Court. The Trustee's attorney also inquired about "the status of the personal injury claim and/or litigation," and requested that Mr. Souweidane "forward copies of all future pleadings to [his] attention."[16]  On that same date, the Trustee's attorney also wrote a letter to Mr. Dixon "requesting documents regarding the status of the

---

[12] (*See id.* at 4 ln. 21.)

[13] (*See id.* at 4 lns. 22-23.)

[14]  (*Id.* at 6 ln. 11.)

[15] (*Id.* at 7 lns. 1-5.)

[16] (*See* Docket # 39, Ex. C of "Trustee's Objection to Debtor's Exemptions.")

6

personal injury lawsuit that was discussed at the 341 First Meeting of Creditors . . . [and] the name of any attorney representing the Debtor and any settlements that have been offered."[17]

*Four and one-half months later*, on June 15, 2006, Debtor filed amended Schedules B and C, through her new attorney, Kevin F. Carr (Docket # 36).  Also on that date, the Chapter 7 Trustee filed an "Application For Appointment of Fraser & Souweidane, P.C. As Special Counsel For The Trustee," to pursue Debtor's "personal injury claim against Michael Rashad Gregory," and the Court entered an Order granting that application.                    Debtor's amended Schedule B was filed almost *9 months* after Debtor's original Schedule B and some *7 months* after the § 341 meeting (during which Mr. Dixon had promised to amend the schedules). The amended Schedule B changed Debtor's disclosure of "[o]ther contingent and unliquidated claims of every nature." The original answer was:  "None."  The amended answer was: "Lawsuit Proceeds: S. Opra vs Michael Gregory, et al," and it valued that asset at $100,000.00.

Debtor's amended Schedule C added claimed exemptions totaling $100,000.00 for this newly-scheduled asset, under 11 U.S.C. §§ 522(d)(5)(claimed exemption of $18,450.00); 522(d)(11)(D)(claimed exemption of $10,100.00); and 522(d)(11)(E)(claimed exemption of $71,450.00).[18]  Debtor later withdrew her claimed exemption of $71,450.00 under

---

[17] (*See id.*)

[18]   Citations to the Bankruptcy Code in this Opinion are to the Code as it existed before it was amended by the "Bankruptcy Abuse Prevention and Consumer Protection Act of 2005" ("BAPCPA"), because Debtor filed her petition on September 26, 2005, before the October 17, 2005 generally effective date of the BAPCPA amendments.

7

§ 522(d)(11)(E), after the Trustee objected to it, leaving exemption claims totaling $28,550.00.[19]

**E. The Trustee's settlement of the undisclosed claim for $100,000**

On June 16, 2006, Mr. Souweidane faxed a letter to the attorney for the Chapter 7 Trustee, informing him that (1) "[Debtor's] claim consists of a third party automobile negligence matter"; (2) "[p]ursuant to [Mich. Comp. Laws Ann.] § 500.3105,[20] a person remains subject to tort liability for non-economic loss caused by his or her ownership, maintenance or use of a motor vehicle only if the injured person has suffered death, serious impairment of a body function or permanent serious disfigurement"; (3) "[Debtor] sustained serious and debilitating injuries as a result of the motor vehicle/motorcycle collision of July 16, 2005"; and (4) "GMAC is tendering its policy limits of its insured in the amount of $100,000.00 for [Debtor's] bodily injury claim."[21]

On motion of the Trustee, the Court entered an Order on July 17, 2006, authorizing the Trustee "to settle the bodily injury claims incurred by the Debtor as a result of an accident between the Debtor and Michael Gregory by accepting the settlement from MIC General Insurance Corporation, a GMAC Insurance Company, for $100,000.00."[22]

---

[19] (*See* "Order Resolving Debtor's Exemption Under 11 U.S.C. § 522(d)(11)(E)" (Docket # 56).)

[20] Presumably, this citation is a typographical error in Mr. Souweidane's letter, and he meant to cite Mich. Comp. Laws Ann. § 500.3135. *See* footnote 33, in Part IV-(A) of this Opinion.

[21] (Docket # 39, Ex. C of "Trustee's Objection to Debtor's Exemptions.")

[22] (Docket # 46.)

8

**F.  The Trustee's objections to Debtor's amended exemptions**

The Trustee timely objected to Debtor's amended exemptions on June 28, 2006 (Docket # 39), in part, based on Debtor's intentional concealment of the $100,000.00 in "Lawsuit Proceeds" and of Debtor's personal injury claim.  The Trustee alleged that Debtor intentionally concealed her personal injury claim and acted in bad faith.  The Trustee also argued that Debtor's amendment to her exemptions should be denied based on the doctrine of laches.

The Court held a hearing on July 26, 2006.  Debtor's new attorney, Kevin F. Carr, argued that Debtor had not concealed the personal injury claim.  Among other things, he argued that the fault for nondisclosure of Debtor's personal injury claim rests solely with Mr. Dixon, because he was aware of the personal injury claim from the beginning of the case, yet failed to schedule it.

**G.  The evidentiary hearing**

The Court held an evidentiary hearing on August 14, 2006.  Mr. Souweidane, Debtor, and Mr. Dixon testified.

**1.  Attorney Souweidane's testimony**

Mr. Souweidane testified that he was retained by Debtor and represented her regarding (1) a potential third party automobile negligence claim against the operator of the vehicle that struck her; and (2) a potential "dram shop" claim against the bar that allegedly served the other driver.

Mr. Souweidane further testified that Debtor signed the Retainer Agreement in the hospital on July 19, 2005 on her own behalf and on her husband's behalf, through a power of attorney executed by her husband.  When Debtor signed the Retainer Agreement, she had the mental capacity to do so.  Between July 19 and September 26, 2005, when Debtor filed her bankruptcy petition, Souweidane had conversations with Debtor regarding the nature of her

9

personal injury claim, the elements he would have to prove in a cause of action against the at-fault driver; and the potential dram shop claim. Souweidane testified that the entire time he represented Debtor, she was aware that there was a potential recovery for her injuries.

Mr. Souweidane further testified that late in 2005, well after Debtor's September 26, 2005 bankruptcy filing, he had his first contact with Mr. Dixon, and discussed with him a possible cause of action that he was investigating for Debtor. At that time, no lawsuit had been filed, but Souweidane was handling an insurance claim on behalf of Debtor with GMAC Insurance Company.

### 2. Debtor's testimony

Debtor's testimony was as follows. In trying to explain why she had falsely testified at the § 341 meeting that she had not retained a lawyer but that her husband had retained a lawyer, Debtor stated:

> Actually when I retained Ed Souweidane, I thought I was retaining him for my husband *not just myself* because my husband did lose his leg. His injuries were great so I didn't know exactly. *I thought it was like a combination thing.* I didn't know that it was *just me* retaining him.

(Emphasis added). Debtor acknowledged on further questioning that the Retainer Agreement was for both herself and her husband. Yet Debtor repeatedly denied that she retained an attorney to get money for her injuries. When asked whether she ever hoped that there was a chance of recovery for her injuries, Debtor stated: "Actually we never really even thought about it, my husband and I, to be honest with you." When asked if she didn't think that she could sue anyone, Debtor stated: "To my knowledge, I didn't even know what was going on. My thing was to get justice for that person who injured us, it wasn't - and to get health care, to be honest with you[.]"

10

Debtor stated that she was mainly interested in getting her medical expenses paid for. Debtor testified that she had insurance on the motorcycle that would cover that too. Debtor testified that the reason she retained an attorney was because her family and friends told her to, not because she wanted to recover money.

Debtor further testified that she did not intend to conceal her personal injury lawsuit. She testified that to the best of her knowledge, she discussed the claim with Mr. Dixon; that Mr. Crosby told Dixon that she was in an accident; that Dixon knew about her personal injury claim from the beginning; and that she had relied on Dixon to list it in the petition. Debtor stated that Mr. Crosby had referred her to both Souweidane and Dixon, and that all three of the attorneys knew about her personal injury claim.

Debtor blamed pain medications and inadvertent error for her failure to list the personal injury claim in her schedules. She testified that she only "glanced" at the schedules before signing them, was on "all types of pain medications," and did not notice that the personal injury claim was not listed in Schedule B. Somewhat inconsistently, Debtor also blamed this omission on the fact that she did not consider the personal injury claim an asset, because when she went to court after her accident the man who hit her didn't have anything and was uninsured, and so she was not sure whether she would get anything. Debtor testified that Mr. Souweidane told her that all he could guarantee was her husband's lost wages and medical expenses *and then he would have to see what else he could get.*

Debtor admitted that when she signed the Questionnaire at the § 341 meeting, *she knew that her answer,* saying that she had disclosed all of her assets in her bankruptcy schedules, *was*

*false*. But she signed the Questionnaire anyway, she said, because Mr. Dixon told her that he would amend the schedules and take care of everything.

Finally, on cross-examination and as impeachment evidence, Debtor admitted that she pled guilty and was convicted in 1999 in Macomb County Circuit Court of embezzlement for stealing $20,000, and also had a conviction regarding bad checks.

### 3. Attorney Dixon's testimony

Mr. Dixon testified as follows. When Debtor first came to his office, she was in a wheelchair and had some medical bills to include in her schedules. He questioned Debtor about the accident and a potential insurance claim. Debtor told him that her husband had suffered an amputation above the knee. She also told Dixon that she had a Titanium pelvis and was on substantial medication due to the accident. Because of Debtor being on medication, Dixon had another person in his office witness all of his conversations with Debtor. Every time he asked Debtor about a potential claim because of the accident, Debtor stated that her husband had the claim, and that she had no claim and was not getting anything.

Mr. Dixon further testified that Debtor did not tell him that she had retained Mr. Souweidane. And Dixon did not see a copy of the Retainer Agreement Debtor had signed with Mr. Souweidane until April 28, 2006.

Mr. Dixon further testified that both he and his secretary had reviewed the bankruptcy schedules with Debtor before they were filed. And Debtor personally filled out the Questionnaire at the § 341 meeting.

After filing the bankruptcy petition and schedules, but sometime before the § 341 meeting on November 16, 2005, Dixon learned from Crosby, the referring attorney, that Debtor had

12

retained Mr. Souweidane. Souweidane told Dixon about the husband's claim *and that there may be a wife's claim attached to it*, but that "no claim had been filed" at that time for Debtor.

Mr. Dixon further testified, somewhat vaguely, that no insurance claim had been filed on behalf of Debtor. Mr. Souweidane told Dixon that he had sent the insurance company a letter, and that was it. Dixon further testified, again somewhat vaguely, that had a "clear claim been filed," he would have disclosed that in the schedules.

Mr. Dixon testified that when he stated in the § 341 meeting that he was going to file an amendment, he meant that he was going to list the husband's claim because it appeared to him that this was what they were talking about at the § 341 meeting.[23] And, Dixon said the reason he did not amend Debtor's schedules for about nine months after filing the petition, and for about seven months after stating at the § 341 meeting that he would do so, was that upon conducting further due diligence, he found that no claim had been "filed" on behalf of Debtor. His due diligence after the § 341 meeting consisted of calling Mr. Crosby and asking if a claim had been filed on behalf of Debtor; searching Macomb County Circuit Court records for a lawsuit in Debtor's name; and asking Debtor if there was a claim filed based on the accident.

### H. Proceedings under Rule 9011

After concluding the evidentiary hearing, the Court *sua sponte* filed a show-cause order under Fed.R.Bankr.P. 9011(b).[24] The order required Mr. Dixon to file a written response to the order, and to appear at a show cause hearing.

---

[23] Amending Debtor's schedules to list *the husband's* claim would not make sense, of course, because Debtor's husband did not file bankruptcy.

[24] (Docket # 63.)

13

Mr. Dixon filed a response on August 31, 2006, which for the most part, repeated his testimony from the August 14, 2006 evidentiary hearing. Dixon also stated in his Response that he had questioned Debtor on several occasions regarding her injuries and the possibility of her recovering any insurance proceeds.[25] In response to his questions, Debtor repeatedly stated that the driver who struck her was uninsured and not collectible and thus, she would get nothing for her injuries.[26] Mr. Dixon also asked Mr. Crosby about this, and Crosby assured him "that no suit was filed and that there were no insurance benefits . . . coming to the [D]ebtor."[27] Finally, Dixon did a search of the Macomb County Circuit Court records and found no lawsuit filed in Debtor's name.[28]

According to Mr. Dixon, the first indication he had that there was a possibility of recovery for Debtor's injuries was in a letter from Mr. Souweidane dated April 28, 2006.[29] After receiving the letter, he called Souweidane, who told him that "no claim was filed, no suit was ever filed, and that continuing negotiations may result in some form of settlement."[30] He told Souweidane "to

---

[25] (*See, e.g.*, Resp. at 1-2 ¶¶ 1-3, 3 ¶ 8 (Docket # 66).)

[26] (*See id.*)

[27] (*Id.* at 2 ¶ 4; *see also id.* at 3 ¶ 8.)

[28] (*Id.* at 3 ¶ 8.)

[29] (*Id.* at 3 ¶ 9.) This April 28, 2006 letter from Souweidane simply enclosed the January 31, 2006 letter from the Trustee to Souweidane, and requested that Dixon call Souweidane to discuss the letter.

[30] (*Id.*)

keep him informed and when the claim settled to call him so he could amend the schedules."[31]

In support of his response, Mr. Dixon attached two affidavits. The first was the Affidavit of Deborah J. West, an employee of Dixon's firm, who witnessed part of a September 2, 2005 meeting between Dixon and Debtor. Ms. West stated, in relevant part:

> While being in [Mr. Dixon's] office, I heard him question [Debtor] as to whether or not she had any lawsuits filed against her or if she was involved in any or going to be involved in any lawsuits. [Debtor] replied "*nothing*!" Again [attorney] Dixon asked if she had any lawsuits, even those related to her accident. [Debtor] stated "*No, none, only my husband. I'm not getting anything, only my husband, the person that hit us was drunk and had no insurance.*"

(Italics in original).

The second affidavit was from Tanya M. Norris, a Legal Assistant with Dixon's firm. Ms. Norris stated that, in preparing Debtor's bankruptcy petition, and on Dixon's instructions, she performed a search for cases filed in Macomb County involving Debtor, and found none. She also stated that Debtor informed her:

> *[O]nly my husband is receiving compensation. He is getting a house equipped for him and it is only in his name, my name is nowhere on it and can't be. They are also giving him a van, which will be in his name only; I get no part of it. I can't have any of it in my name.*

(Italics in original, underlining added).

The Court held the Rule 9011 show cause hearing on October 4, 2006. Mr. Dixon appeared with counsel and stated, among other things, that he questioned attorneys Souweidane

---

[31] (*Id.* at 3 ¶ 10.)

and Crosby, and both stated that "no claim" on behalf of Debtor had been "filed."  Dixon again

stated that had any "clear legal claim been filed," he would have disclosed it.

## III.  Jurisdiction

This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1334(b),

157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.).  This is a core proceeding under 28

U.S.C. §§ 157(b)(2)(A), (B), and (O).

## IV.  Discussion

### A.  Attorney Dixon's violation of Fed. R. Bankr. P. 9011(b)(2) and (b)(3)

The Court concludes that Mr. Dixon and his firm violated Fed. R. Bankr. P. 9011(b)(2)

and (b)(3) by filing Debtor's original bankruptcy Schedule B.  That schedule failed to disclose

Debtor's personal injury claim that was later disclosed as "Lawsuit Proceeds" in Debtor's

amended Schedule B, and, in fact, stated that Debtor had no such claim ("None").

Fed. R. Bankr. P. 9011(b) provides, in pertinent part:

> **(b)  Representations to the Court.**  By presenting to the court
> (whether by signing, filing, submitting, or later advocating) a
> petition, pleading, written motion, or other paper, an attorney or
> unrepresented party is certifying that to the best of the person's
> knowledge, information, and belief, formed after an inquiry
> reasonable under the circumstances,--
> . . .
> (2)  the claims, defenses, and other legal contentions therein
> are warranted by existing law or by a nonfrivolous argument for the
> extension, modification, or reversal of existing law or the
> establishment of new law[.]
>
> (3)  the allegations and other factual contentions have
> evidentiary support. . . .[32]

---

[32] The instructions for completing Official Form 1, Voluntary Petition, for cases like this one filed

(continued...)

16

Given what Mr. Dixon admits he knew when he filed Debtor's original Schedule B, there was no colorable basis for him to fail to list Debtor's personal injury claim. Mr. Dixon knew that pre-petition, Debtor was in a motorcycle accident in which she was hit by a drunk driver who was totally at fault. He also knew that Debtor's injuries were very serious and that she had "pins up and down her legs" and a "Titanium pelvis" due to the accident. He observed that Debtor was in a wheelchair when she met with him. He knew that she was still on medication due to the accident. Given all of this, Debtor clearly had a duty, when she filed bankruptcy, to list her personal injury claim in Schedule B. There is no nonfrivolous argument to the contrary. Mr. Dixon, therefore, had a duty under Rule 9011(b) to file a Schedule B that disclosed Debtor's personal injury claim, *not* one that stated that there was no such claim.

As an initial matter, the law is clear that all of a debtor's claims, including personal injury claims, become property of the bankruptcy estate under 11 U.S.C. § 541, upon the bankruptcy filing. *E.g., Cottrell v. Schilling (In re Cottrell)*, 876 F.2d 540, 542-43 (6th Cir. 1989). Mr. Dixon apparently contends that Debtor did not have a "claim" that needed to be listed on

---

[32](...continued)
before October 17, 2005, reminded Debtor and Mr. Dixon of Rule 9011:

> By signing, filing, or submitting a petition, schedule, statement, or other paper with the court, the debtor and the debtor's attorney (if any) are certifying - to the best of each person's knowledge, information and belief, formed after an inquiry reasonable under the circumstances – that the petition, schedule, statement, or other paper meets the evidentiary legal standards set out in Bankruptcy Rule 9011(b). Under the rule, each person also certifies that the petition, schedule, statement, or other paper is not being presented to the court for any improper purpose such as causing unnecessary delay or to harass. After notice and an opportunity to respond, the court may sanction violation of the rule. Fed. R. Bankr. P. 9011(c).

Schedule B unless and until she *asserted* a claim (*e.g.*, by filing a lawsuit or making an insurance claim,) or until she was *certain to recover* on a claim (*e.g.*, through entering into a settlement agreement with an insurance company.) Mr. Dixon cites no authority for this contention, and it is plainly incorrect. Further, it is not "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed. R. Bankr. P. 9011(b)(2).

The case of *Rose v. Beverly Health and Rehabilitation Services, Inc.*, 356 B.R. 18 (E.D. Cal. 2006) is instructive. In that case, the plaintiff in an employment discrimination lawsuit had, before filing the lawsuit, filed a Chapter 7 bankruptcy case. Even though all the events giving rise to the cause of action occurred pre-petition, the debtor did not list an employment discrimination claim in Schedule B. *Rose*, 356 B.R. at 21-22. "Plaintiff did not . . . indicate the existence of any claims against Defendants anywhere in the information filed in connection with her Chapter 7 Petition." *Id*. The debtor then filed an employment discrimination lawsuit, and the defendants moved to dismiss based on judicial estoppel. After reviewing the relevant case law, the *Rose* court explained that the plaintiff "had a duty to disclose to the bankruptcy court any potential claims she may have had against [the] Defendants" where "the claim that was later asserted had already accrued and the facts upon which that claim would be based were known." *Id*. at 25. The *Rose* court stated:

> [T]he duty of the bankruptcy petitioner to disclose the existence of a potential claim is not a formalistic duty predicated on the procedural status of a claim, but is a duty of candor that accrues from the time the facts that give rise to the potential claim are known. It is also clear . . . that the subjective intent of the bankruptcy petitioner at the time of the bankruptcy filing to pursue or not pursue the claims is not relevant. The duty of the bankruptcy

18

petitioner is to disclose all actual and potential assets of the bankruptcy estate, not just those assets the petitioner may subjectively cho[o]se to pursue.

*Id.* (citations omitted). The *Rose* court rejected the argument that Mr. Dixon makes in this case:

The crux of Plaintiff's argument appears to be that she did not mislead the bankruptcy court because she did not have any "claims" to list at question 20 on Schedule "B." Apparently, Plaintiff's contention is that a "claim" does not exist until it is filed or in some other way formalized or acted upon. Plaintiff presents no support for this hyper-technical interpretation of the word "claim," an interpretation that runs directly contrary to the way that term is used in each of the cases cited above. . . . [T]he court finds the term "claim" incorporates any potential cause of action that has accrued and whose facts are sufficiently well known to the Plaintiff to indicate the existence of a potential asset. Nothing in the cases examined supports the notion that a "claim" need not be listed as a bankruptcy asset unless it has been formally acted upon.

*Id.* at 25-26 (citations omitted).

When Debtor filed her petition in this case, she definitely had an interest in one or more claims arising out of the motorcycle accident that had to be disclosed in Schedule B. Based on facts that occurred pre-petition that were known to Mr. Dixon, Debtor had a claim under Michigan law against the drunk driver who hit Debtor's motorcycle.[33] She also had potential claims against:

---

[33] The Michigan No-Fault Insurance Act, Mich. Comp. Laws Ann. §§ 500.3101-500.3179, did not abolish all tort liability. Mich. Comp. Laws Ann. § 500.3135(1) provides:

(1) A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.

Given the nature and seriousness of Debtor's injuries, Debtor had a claim against the drunk driver, based on his use of the vehicle that struck her, under this provision.

19

(1) the owner of the other vehicle involved in the accident;[34] and

(2) the insurance company(ies) who insured each of the following:

      (a) the owner of the other vehicle;

      (b) the drunk driver;

      (c) Debtor's husband, who operated the motorcycle Debtor was riding on;

      (d) the owner of the motorcycle;[35] and

(3) the person(s) who sold, gave or furnished alcohol to the drunk driver.[36]

---

[34] *See* Mich. Comp. Laws Ann. § 500.3135(1), quoted in the previous footnote (allowing "tort liability for noneconomic loss" to attach to the *owner* of a motor vehicle, if "an injured person has suffered death, serious impairment of body function or permanent disfigurement," as a result of the ownership of the vehicle).

[35] Under the Michigan No-Fault Insurance Act, "those injured in a motor vehicle accident while operating or riding a motorcycle . . . [must] seek recovery of PIP [(Personal Injury Protection)] benefits from the insurer of the owner, and then the operator, of the motor vehicle involved in the accident." *State of Michigan Assigned Claims Facility v. Felski* (*In re Felski*), 277 B.R. 732, 733-34 (E.D. Mich. 2002)(citing Mich. Comp. Laws § 500.3114(5)).  Mich. Comp. Laws Ann. § 500.3114(5) provides:

> (5) A person suffering accidental bodily injury arising from a motor vehicle accident which shows evidence of the involvement of a motor vehicle while an operator or passenger of a motorcycle shall claim personal protection insurance benefits from insurers in the following order of priority:
>
> (a) The insurer of the owner or registrant of the motor vehicle involved in the accident.
>
> (b) The insurer of the operator of the motor vehicle involved in the accident.
>
> (c) The motor vehicle insurer of the operator of the motorcycle involved in the accident.
>
> (d) The motor vehicle insurer of the owner or registrant of the motorcycle involved in the accident.

[36] Under Mich. Comp. Laws Ann. § 436.1801(3), Michigan's dram shop act, "an individual who suffers damage or who is personally injured by a . . . visibly intoxicated person by reason of the unlawful

(continued...)

Mr. Souweidane, Debtor's personal injury attorney, investigated these claims.[37]

At the show cause hearing, Mr. Dixon professed to have very limited knowledge of Michigan's no-fault law. But he did not contend that his knowledge of Michigan law was so limited that he did not know that Debtor had *any* claims. And even if Mr. Dixon was not sufficiently well-versed in Michigan law to know whether Debtor had any claims, he had a duty under Rule 9011(b) to conduct a "reasonable" inquiry into that law before indicating in Debtor's Schedule B that she had *no claims*. By its terms, Rule 9011(b) imposes a duty on the attorney to conduct an "inquiry reasonable under the circumstances" into both fact and law. *See, e.g., Anderson v. McGowan (In re Anderson)*, 128 B.R. 850, 855-57 (D. R.I. 1991). Mr. Dixon does not claim to have made *any* inquiry into Michigan law, much less a reasonable inquiry. Nor did he make a reasonable inquiry about the facts related to Debtor's various possible claims under Michigan law, described above.

Rather, Mr. Dixon chose not to list any personal injury claim in Debtor's Schedule B because of his belief that no claim can *exist* unless and until a party either formally asserts it or is certain to collect on it. That view is frivolous. As discussed above, Debtor's claims definitely

---

[36](...continued)
selling, giving, or furnishing of alcoholic liquor to the . . . visibly intoxicated person, if the unlawful sale is proven to be a proximate cause of the damage, injury, or death . . . shall have a right of action in his or her name against the person who by selling, giving, or furnishing the alcoholic liquor has caused or contributed to the intoxication of the person or who has caused or contributed to the damage, injury, or death."

[37] In a letter dated November 16, 2006 to the Trustee explaining what services he had performed, Mr. Souweidane, who by then was the Trustee's attorney, indicated he had investigated any potential third party claim Debtor may have had against the owner of the vehicle that struck her and against the drunk driver of that vehicle. Debtor's attorney also stated that he investigated any potential dram shop claim. (*See* letter attached to the "Application of the Law Offices of Fraser & Souweidane, P.C. for Compensation and Reimbursement of Expenses Incurred As Special Counsel For Trustee" (Docket # 76)).

*existed*, whether or not any lawsuit had yet been filed, and whether or not any formal claim had yet been made with an insurance company on Debtor's behalf.

Similarly, whether Debtor's various claims arising from the accident were *collectible* was irrelevant to whether there was a claim that should have been listed on Schedule B. It was for the Chapter 7 Trustee, not Debtor or Debtor's attorney, to determine whether Debtor's personal injury claim had value, and whether it should be pursued or abandoned. Debtor had a duty to disclose the claim in Schedule B, even if she and Mr. Dixon thought the claim had no value. These concepts are fundamental and well-established. As the Court stated in *Lewis v. Summers* (*In re Summers*), 320 B.R. 630, 647 (Bankr. E.D. Mich. 2005): "It is not up to the Debtor to decide whether or not to list property based on his belief as to value. Even if the debtor thinks the assets are worthless he must nonetheless make full disclosure." (Internal quotation marks and citation omitted).[38]

"[T]he test for imposing Rule 9011 sanctions is whether the individual's conduct was reasonable under the circumstances" at the time of the conduct, without the use of hindsight. *Mapother & Mapother, P.S.C. v. Cooper* (*In re Downs*) 103 F.3d 472, 481 (6th Cir. 1996). Applying this standard, the Court determines that when Mr. Dixon filed Debtor's bankruptcy

---

[38] *See also Trustee v. Halishak* (*In re Halishak*), 337 B.R. 620, 631 (Bankr. N.D. Ohio 2005)("[I]t is not for a debtor to decide what property interests are worth disclosing and what are not."); *In re Upshur*, 317 B.R. 446, 452-54 (Bankr. N.D. Ga. 2004)(when a bankruptcy case is filed, "all causes of action belonging to a debtor at the commencement of a case" become property of the bankruptcy estate and "[a] trustee is the only proper party in interest with standing to prosecute causes of action belonging to the estate," and to "decide whether to prosecute, resolve it, or abandon it"); *Siegel v. Weldon* (*In re Weldon*), 184 B.R. 710, 715 (Bankr. D.S.C. 1995)("The bankruptcy schedules and statements of affairs are carefully designed to elicit certain information necessary to the proper administration and adjudication of the case. To allow the Debtor to use his discretion in determining the relevant information to disclose would create an end-run around this strictly crafted system.").

petition and schedules, his failure to list any personal injury claim in Schedule B was *not*

"reasonable under the circumstances."  Based on the facts that he knew when he filed Debtor's

petition and schedules, Mr. Dixon violated Rule 9011(b)(2) and (b)(3).

### B.  The appropriate sanctions for the Rule 9011 violation

Having concluded that Mr. Dixon, and by extension his law firm, violated Rule 9011(b)(2)

and (b)(3), the Court concludes that they should be sanctioned.  The issue becomes what

sanction(s) should be imposed.  Fed. R. Bankr. P. 9011(c) provides:

> **(c)  Sanctions.**  If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

Because this Rule 9011 matter was initiated by the Court rather than by a motion filed by a party,

the only available sanctions expressly authorized by Rule 9011(c)(2) are (1) nonmonetary

"directives;" and (2) a "penalty" to be paid into court.  In this situation, other than such a

"penalty," the Rule does not authorize monetary sanctions.  Rule 9011(c)(2) states, in part:

> **(3) Nature of Sanction; Limitations.** A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, **or,** *if imposed on motion* and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

Fed. R. Bankr. P. 9011(c)(2)(emphasis added).

23

Even though monetary sanctions, such as requiring the offending attorney to pay his opponent's attorney fees, are not authorized by Rule 9011 in this situation, there are cases suggesting that such monetary sanctions may be imposed under 11 U.S.C. § 105(a)[39] and under the Court's inherent authority to impose sanctions on attorneys appearing before it. In *Miller v. Cardinale* (*In re DeVille*), 361 F.3d 539, 550-51 (9th Cir. 2004) the court of appeals recognized a bankruptcy court's inherent power to sanction. And the court noted that "the Supreme Court [in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)] has emphatically rejected the notion that . . . the sanctioning provisions in the Federal Rules of Civil Procedure displaced the inherent power to impose sanctions for bad faith conduct." The court held "that a court 'may safely rely on its inherent power' as a sanctioning tool in instances when statutes or rules prove inadequate to remedy misconduct." Similarly, in *Knowles Building Co. v. Zinni* (*In re Zinni*), 261 B.R. 196, 203 (B.A.P. 6th Cir. 2001), the court held that "federal courts, including the bankruptcy court, have the inherent power to impose sanctions on a scope broader than that of Bankruptcy Rule 9011, including monetary sanctions." *See also Marrama v. Citizens Bank of Massachusetts*, 127 S.Ct. 1105, 1112 (2007)(recognizing a bankruptcy court's broad authority under 11 U.S.C. § 105(a) and "the inherent power of every federal court to sanction 'abusive litigation practices'").[40]

---

[39] 11 U.S.C. § 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[40] The dissenting opinion in *Marrama* also recognized the bankruptcy court's statutory power under § 105(a) as well as its inherent power: "Bankruptcy courts have used their statutory and equitable

(continued...)

Rather than requiring Mr. Dixon and his firm to pay some or all of the Chapter 7 Trustee's attorney fees, however, the Court will impose the penalty sanction that is expressly authorized by Rule 9011(c)(2). The Court will require Mr. Dixon and his firm "to pay a penalty into court." This is an appropriate choice in this case, because (1) the sanction amount that the Court is imposing is relatively small; and (2) the Chapter 7 Trustee, and therefore the bankruptcy estate, has not suffered any net loss because of the conduct being sanctioned. Because the Court is denying Debtor's $28,550.00 claimed exemption, as discussed later in this opinion, the bankruptcy estate will recover substantially more than the $7,000 to $8,000 that it has incurred in attorney fees for the Trustee to object to Debtor's amended exemptions.[41] In the end, therefore, the initial nondisclosure of Debtor's personal injury claim will not have caused any net loss to the bankruptcy estate, in the form of additional Trustee attorney fees. There is no need in this case, then, to require Mr. Dixon to compensate the estate for any such loss.

As Rule 9011(c)(2) indicates, Rule 9011 sanctions must be limited to what is necessary to deter the offending attorney from repeating the sanctioned conduct, and to deter others from engaging in comparable conduct. And sanctions must be "commensurate with the egregiousness of the conduct." *See Mapother & Mapother P.S.C. v. Cooper,* 103 F.3d at 477.

---

[40](...continued)
authority to craft various remedies for a range of bad faith conduct: . . . penalizing counsel; assessing costs and fees." 127 S.Ct. at 1116-17.

[41] The first interim fee application filed by the Trustee's counsel on November 9, 2006 (Docket # 72) sought approval of $11,051.50 in attorney fees. The Court granted that interim fee application on December 9, 2006 (Docket # 80). The itemized time entries attached as Exhibit E to that fee application indicate that at least $7,067.50 in attorney fees were incurred by the Trustee in prosecuting his objections to the Debtor's amended exemption, and that the Trustee incurred another $1,287.00 in fees in work related to the Court's Rule 9011 show cause order against Mr. Dixon.

25

The Court concludes that in this case, the appropriate sanction is to require Mr. Dixon and his law firm, jointly and severally, to pay a penalty into court of $2,000.00. This sanction amount is necessary to deter Mr. Dixon and other attorneys from failing to properly disclose assets in the debtor's schedules. Yet it is not so steep as to unduly damage Mr. Dixon and his firm. To put this amount in perspective, it is only $1,000.00 more than the $1,000.00 fee that Mr. Dixon received from Debtor to file this case.[42]

This sanction is also "commensurate with the egregiousness of the conduct." *Mapother & Mapother*, 103 F.3d at 477. In this regard, if anything, the sanction is too light. Mr. Dixon's violation of Rule 9011(b) appears to have resulted from a misapprehension of the law and of his duties under the law, and not from any intention on his part to defraud the bankruptcy estate. But Mr. Dixon failed to list a significant asset in Debtor's Schedule B, an asset that later turned out to be worth $100,000.00. And $71,450.00 of that asset, Debtor now admits, could not have been exempted in any event, even if Debtor had timely disclosed it.

Complete and accurate disclosure is vital to the administration of the bankruptcy estate and the integrity of the bankruptcy system. Failing to disclose an asset when filing a bankruptcy petition is a very serious matter. In *Tennyson v. Challenge Realty* (*In re Tennyson*), 313 B.R. 402, 406 (Bankr. W.D. Ky. 2004), the court emphasized the importance of full and complete disclosure to the bankruptcy process:

> Every debtor in bankruptcy has an absolute obligation to schedule every asset on their bankruptcy schedules. 11 U.S.C. § 521(1). The duty to disclose is a continuing one that does not end once the forms are submitted to the bankruptcy court. Full and honest

---

[42] (See Docket # 1 at 66.)

> disclosure in a bankruptcy case is crucial to the effective
> functioning of the federal bankruptcy system. Full disclosure is the
> cornerstone and capstone of any bankruptcy case and is necessary
> for the successful administration of a bankruptcy estate.

*Id.* (internal quotation marks and citation omitted); *see also Roudebush v. Sharp* (*In re Sharp*), 244 B.R. 889, 891 (Bankr. E.D. Mich. 2000)("'A debtor's complete disclosure is essential to the proper administration of the bankruptcy estate.'")(citation omitted); *In re Orth,* 251 B.R. 333, 335 (Bankr. W.D. Mich. 2000)("'To a substantial extent, the trustee's ability to perform the duties set forth in 11 U.S.C. § 704 depends on the accuracy and completeness of the debtor's disclosures.'")(quoting *Sharp*, 244 B.R. at 889).

### C. The Trustee's objections to Debtor's amended claim of exemption

Fed. R. Bankr. P. 1009(a) states that "[a] voluntary petition, list, schedule, or statement may be amended by the debtor as a matter of course at any time before the case is closed." However, "[c]ourts may still refuse to allow an amendment where the debtor has acted in bad faith or where property has been concealed." *Lucius v. McLemore*, 741 F.2d 125, 127 (6th Cir. 1984). "Bad faith may be indicated when the debtor attempts to conceal an asset." *In re Lundy*, 216 B.R. 609, 610 (Bankr. E.D. Mich. 1998). "In the context of an amendment of exemptions, bad faith is determined by an examination of the totality of the circumstances. Mere allegations of bad faith will not suffice; the objecting party must demonstrate the bad faith of the debtor by specific evidence." *In re Colvin*, 288 B.R. 477, 481-82 (Bankr. E.D. Mich. 2003)(citations omitted). A party objecting to a debtor's claim of exemptions based on bad faith or concealment has the burden of proving it by a preponderance of the evidence. *See* Fed. R. Bankr. P. 4003(c); *In re Kimble*, 344 B.R. 546, 551 (Bankr. S.D. Ohio 2006).

The Trustee alleges that Debtor is guilty of bad faith, and that she intentionally concealed her personal injury claim arising out of the July 2005 accident, when she failed to disclose it in her original Schedule B. The Trustee further alleges that Debtor continued to try to conceal the claim at the § 341 meeting.

The Court concludes that the Trustee has met his burden of establishing these allegations by a preponderance of the evidence. The Court finds that Debtor's failure to disclose her personal injury claim in her original Schedule B was not inadvertent, but rather was an intentional concealment of an asset that she knew existed and knew should have been listed. And the Court finds, based on the totality of the circumstances, including the intentional concealment by Debtor of the asset, that Debtor acted in bad faith.

The evidence of Debtor's intentional concealment and bad faith includes the following. Debtor failed to disclose her personal injury claim in her original Schedule B. She affirmatively stated in Schedule B that there was no such claim when she answered "none" at Item Nos. 20 and 33. And she declared under penalty of perjury that she had read Schedule B and that it was true and correct.

Both before filing her bankruptcy case and her false Schedule B, and after filing the bankruptcy case, Debtor tried to conceal her personal injury claim from her own bankruptcy attorney, Mr. Dixon, by repeatedly telling him that she had no claim, would not be receiving anything for her injuries from the motorcycle accident, and that only her nonfiling spouse was getting anything. Debtor repeatedly made these statements to Mr. Dixon after Debtor had retained Mr. Souweidane. As the Retainer Agreement that Debtor signed, but did not disclose to

28

Mr. Dixon, stated, Mr. Souweidane was "to prosecute one or more claims and all damages sustained by" both Debtor and her husband as a result of the July 16, 2005 accident. And Debtor made these statements to Mr. Dixon after Mr. Souweidane had explained to Debtor that she could potentially recover for her injuries. And while telling Mr. Dixon that she could not recover anything for her injuries, Debtor did not tell Mr. Dixon (1) that she had retained an attorney to pursue a personal injury claim on her behalf; and (2) that her personal injury attorney had advised her that she had claims she could pursue, and that she could potentially recover for her injuries.

At the § 341 meeting, Debtor continued to try to conceal her injury claim. Debtor falsely indicated on the Questionnaire that she was not thinking about suing anyone for any reason, when, only a few months earlier, she had hired Mr. Souweidane to prosecute a claim on her behalf as well as her husband's behalf. Debtor also falsely testified at the § 341 meeting that only her husband had retained a lawyer, and that she had not done so. In fact, it was Debtor, not her husband, who had signed the Retainer Agreement retaining Mr. Souweidane.

The Court simply does not believe that Debtor's failure to disclose her personal injury claim was inadvertent. Rather, the Court finds that Debtor *intended* the effect of her failure to disclose the personal injury claim, and her false Schedule B, false Questionnaire answers, and false § 341 meeting testimony: namely, she intended to conceal her claim from the Trustee and her creditors. The effect of Debtor's concealment, of course, was to hide from the Trustee and her creditors a significant asset. Until the specific, direct questioning of Debtor by creditors' attorney Mr. Joseph at the § 341 meeting, Debtor gave no disclosure whatsoever in any paper or testimony in this bankruptcy case of her July 2005 accident or her personal injury claim.

29

Debtor has not provided any credible excuse for her omissions and false statements. After the facts of her pre-petition accident came out under questioning by the creditors' attorney at the § 341 meeting, Debtor testified, falsely, that a personal injury claim *was* listed in her schedules but valued at zero dollars because the driver of the vehicle had no insurance. Contrary to this testimony, Debtor testified at the evidentiary hearing that she *knew* at the § 341 meeting that her personal injury claim was not listed in her schedules. Debtor further testified, at the evidentiary hearing, that she gave this false testimony at the § 341 meeting because Mr. Dixon told her that he would amend her schedules to include it. That explanation, of course, does not excuse or justify Debtor's giving false testimony at the § 341 meeting. And it is simply not credible in any event.

Debtor claimed at the evidentiary hearing that the failure to schedule her personal injury claim was not her fault at all, but was instead Mr. Dixon's fault. Debtor testified that Mr. Dixon knew about the personal injury claim from the very beginning of the case, and that she relied on him to "handle everything," presumably meaning to list the claim in her schedules. Debtor then testified that she failed to notice that the claim was not disclosed in Schedule B, and blamed this on the fact that she only glanced at her petition and schedules before signing them, and that she was not in her right mind due to pain medications she was taking at the time.

This latter testimony, claiming that she failed to notice the inaccuracy in her Schedule B when she signed it under penalty of perjury, implies that Debtor knew when she filed this bankruptcy case that the personal injury claim needed to be listed in her Schedule B. And, of

30

course, the Debtor signed and filed a declaration, under penalty of perjury, verifying not only the accuracy of her schedules, but also that she had actually read them.[43]

In considering all the evidence and in evaluating Debtor's credibility, the Court simply does not believe Debtor's claim that she failed to notice that her personal injury claim was not listed in Schedule B. And the Court finds that Debtor was aware, when she signed her bankruptcy petition and schedules, that Schedule B was inaccurate because (a) it did not disclose her personal injury claim; and (b) it affirmatively stated that she had no such claim ("none").

There is a further problem with Debtor's claimed excuse, that she only glanced at her petition and schedules before signing them. Debtor had a duty to do much more than just "glance" at her schedules. Indeed, Debtor had "a paramount duty to carefully consider all questions included in the Schedules and [Statement of Financial Affairs] and see that each is answered accurately and completely." *In re Colvin*, 288 B.R. 477, 480 (Bankr. E.D. Mich. 2003)(quoting *Casey v. Kasal (In re Kasal)*, 217 B.R. 727, 734 (Bankr. E.D. Pa. 1998), *aff'd*, 223 B.R. 879 (E.D. Pa. 1998)).

As yet another excuse for her failure to list her personal injury claim in her schedules, Debtor testified at the evidentiary that she did not consider her personal injury claim an asset that must be listed in her schedules. This is so, Debtor said, because when she went to court after the accident, she learned that the driver who hit her did not have any assets and was uninsured, and thus she did not know whether she would get anything. Of course, as discussed in Part IV-A of this opinion, not knowing whether the claim would actually yield any money is no excuse for

---

[43] (Docket # 1 at 56.)

failing to list the claim in Schedule B. Furthermore, Debtor's testimony is simply not credible, and it is contradicted by the testimony of Mr. Souweidane. The Court credits Mr. Souweidane's testimony, who testified that the entire time he was representing Debtor, including before Debtor filed bankruptcy, she was aware of a potential recovery for her injuries, and that he had discussed with Debtor the nature of her claim and the elements he would have to prove to recover on her claim.

Based on all of the evidence and the Court's assessment of Debtor's credibility, the Court is convinced that Debtor knowingly and intentionally failed to disclose her personal injury claim in her Schedule B in an attempt to conceal it from her bankruptcy Trustee and creditors. And Debtor continued to conceal the asset after filing bankruptcy by trying to mislead the Trustee and the creditors at the § 341 meeting. In all of this, Debtor acted in bad faith.

Based on these findings, the Debtor's amendment to her claim of exemptions, seeking to exempt the personal injury claim and its proceeds, will not be permitted. Under the Sixth Circuit's decision in *Lucius v. McLemore*, the Court has discretion to deny Debtor's amended claim of exemption in its entirety. This is the appropriate remedy here, because of the egregiousness of Debtor's conduct, and also because the Court must try to deter similar conduct by other bankruptcy debtors in the future. As the courts have noted,

> If debtors could omit assets at will, with the only penalty that they
> had to file an amended claim once caught, cheating would be
> altogether too attractive. . . When it is hard to detect an effort to
> evade the law, the penalty must exceed the profits of the evasion.

*In re Colvin*, 288 B.R. at 483 (quoting *Payne v. Wood*, 775 F.2d 202, 205 (7th Cir. 1985)).

32

For these reasons, the Court will sustain the Trustee's objection to Debtor's amended exemption.[44]

The Court will issue an order consistent with this opinion.

**FOR PUBLICATION**

.

**Signed on March 28, 2007**

                                                         **/s/ Thomas J. Tucker**
                                                      **Thomas J. Tucker**
                                                      **United States Bankruptcy Judge**

---

[44] Given this disposition, it is not necessary to decide the merits of the Trustee's laches argument.

33